UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


TIMOTHY MORRISSEY,               )
                    Plaintiff    )
                                 )
                                 )
           v.                    )    Civil Action No. 10-30052-KPN
                                 )
                                 )
TOWN OF AGAWAM, AGAWAM           )
POLICE DEPARTMENT, PATROLMAN     )
EDWARD B. CONNOR, PATROLMAN      )
MARK CECCARINI and UNKNOWN       )
PATROLMEN                        )
                    Defendants   )


MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (Document No. 33)
July 12, 2012

NEIMAN, U.S.M.J.

        The present action arises out of an incident of alleged police misconduct which

occurred on March 15, 2007.  Timothy Morrissey ("Plaintiff"), a diabetic, has filed an

action asserting claims pursuant to 42 U.S.C. § 1983, the Massachusetts Civil Rights

Act ("MCRA"), MASS. GEN. L. ch. 12 § 11I, and state common law.  Plaintiff alleges that

Patrolmen Edward B. Connor ("Connor") and Mark Ceccarini ("Ceccarini") used

excessive force to apprehend him while he was suffering from a diabetic episode,

subsequently fabricated criminal charges to cover up their physical abuse of him, and

intentionally inflicted him with emotional distress.  Plaintiff further alleges, pursuant to

section 1983 and the MCRA, that the Agawam Police Department ("APD") and the

Town of Agawam ("Agawam") (together with Connor and Ceccarini, "Defendants")

maintain a policy, custom or practice that permits such behavior. Defendants deny Plaintiff's claims and, with regard to the section 1983 and MCRA claims against Connor and Ceccarini, assert that they are entitled to qualified immunity.[1]

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties have consented to the jurisdiction of this court. Presently, Defendants seek summary judgment on all of Plaintiff's claims. For the reasons that follow, the court will allow Defendants' motion.

## I. BACKGROUND

The parties do not dispute the following facts, which are construed in a light most favorable to Plaintiff, the non-moving party. In 1986, Plaintiff was diagnosed with Diabetes Mellitus Type I. (Defendants' Statement of Facts ("Defs. SOF") ¶ 7.) As a result, Plaintiff takes a form of insulin called Humalog on a daily basis. (Id. ¶ 9.) Prior to March 15, 2007, Plaintiff had suffered from hypoglycemia, or low blood sugar. On such occasions, Plaintiff typically felt "confused" and sometimes "sweaty." (Id. ¶ 10.) Normally, Plaintiff tested his blood sugar prior to eating and before going to bed. On the day of the incident, however, Plaintiff had not tested his blood sugar since before dinner on the previous day. (Id. ¶ 13.)

It is undisputed that Plaintiff has only a "limited" recollection of the incident. (Id. ¶ 41.) As a result, the court credits Plaintiff's version of events only where he has a

---

[1] In addition to Connor and Ceccarini, Plaintiff's complaint names "unknown patrolmen." However, as the complaint has not been further amended and no other patrolmen have been identified, the court assumes that Plaintiff's allegations pertain only to the identified defendants listed as parties in Plaintiff's first amended complaint.

specific recollection; all other facts are derived from the version of the incident provided by the police officers.  Plaintiff left his house at approximately 7:00 a.m. in a Dodge Caravan minivan, at which time he "felt fine."  (Id. ¶ 14.)  Plaintiff was not wearing any identification that would alert anyone to the fact that he was diabetic.  (Id. ¶ 38.)  Plaintiff does not recall driving erratically.  (Id. ¶ 24.)  At around 8:43 a.m., Connor received a call from dispatch ordering him to report to Route 57 in response to a call complaining of an "erratic driver" traveling eastbound.  (Id. ¶ 43.)  Upon his arrival, Connor observed Plaintiff's van crossing into the west bound lane, thereby causing vehicles traveling west to swerve to the right to avoid a collision with Plaintiff's vehicle.  (Id. ¶ 45.)  Plaintiff recalls seeing the car behind him turn on its lights but does not recall where he was at the time.  (Id. ¶ 24.)  Plaintiff recalls thinking the car behind him wanted to pass him and so he pulled over to the side of the road.  (Id. ¶¶ 25, 46.)  Connor pulled his cruiser in front of Plaintiff's van.  (Id. ¶ 47.)[2]

Plaintiff remembers someone coming over to his driver-side window and asking him to roll it down but that "he could not figure out how to do it."  (Id. ¶ 27.)  Plaintiff also remembers someone saying to him, "Roll down your window[ ] . . . If not, we'll break it."  (Id. ¶ 28.)  Plaintiff recalls that, while looking down in his van with the windows closed, he stated, possibly more than once, "I'm fucking diabetic."  (Id. ¶¶ 28-29; Plaintiff's Statement of Facts ("Pl. SOF") ¶¶ 28-29.)  Connor states that he did not

---

[2] Connor asserts that he pulled behind Plaintiff while driving and turned on his lights and his siren.  When Plaintiff failed to pull over, Connor passed Plaintiff's vehicle and cut him off to stop him.  (Defs. SOF ¶¶ 44-45.)  However, for present purposes, this memorandum will credit Plaintiff's version of events.

hear Plaintiff say he was diabetic and believes that, when asked to roll down his window, Plaintiff responded, "fuck you hold on." (Id. ¶¶ 46, 48.)

While Connor was at Plaintiff's driver-side window, Ceccarini arrived on the scene, also in response to the dispatch call regarding an erratic driver. (Id. ¶ 47.) Ceccarini saw Connor's cruiser stopped in front of Plaintiff's van and he pulled up behind Plaintiff's vehicle. (Id. ¶¶ 47, 48.) Ceccarini confirmed that Connor was giving commands to Plaintiff and ordering him to put his vehicle in park and, further, asserts that Plaintiff responded, "No, I'm not going to fucking put the car in park." (Id. ¶ 50.) Ceccarini also recalls that Connor ordered Plaintiff to unlock his door and roll down his window and that Plaintiff refused to comply. (Id. ¶ 51.)

After asking Plaintiff to open his window several times, Connor asked Ceccarini to retrieve his nightstick. Connor again asked Plaintiff to open his window. Both Connor and Ceccarini assert that, rather than comply, Plaintiff grabbed the steering wheel while attempting to use his right hand to put the vehicle into drive. (Id. ¶¶ 52, 54.) At that point, Connor broke Plaintiff's driver-side window with Ceccarini's night stick, opened the car door, and grabbed Plaintiff who, according to Connor, "was still struggling to put the vehicle in gear." (Id. ¶ 53.)[3] Plaintiff has no memory of any of these events, except that he remembers seeing glass on his lap while he was still seated in the van. (Id. ¶ 34.)

---

[3] Plaintiff disputes that he was trying to drive away. (Pl. SOF ¶¶ 52-54.) However, Plaintiff does not refer to any evidence in the record to refute the police officers' recollection of events and, as indicated, Plaintiff himself has no memory of this portion of the incident.

According to Connor and Ceccarini, Plaintiff then began to struggle with them as they attempted to get him out of the vehicle.  (Id. ¶ 57.)  It is unclear if Connor opened the door to force Plaintiff out of the car or if he pulled Plaintiff through the shattered window.  Plaintiff has no memory of exiting the vehicle.  (Id. ¶ 34.)  In any event, the officers assert that Plaintiff was kicking and screaming and refused to comply with verbal commands that he stop resisting.  Moreover, once outside the vehicle, Plaintiff continued to struggle with Connor and Ceccarini, who forced him to the ground.  (Id.)  Once on the ground, Plaintiff continued to resist and refused to follow orders to put his hands behind his back; rather, he attempted to get up off the ground several times.  (Id. ¶ 59.)  At that point, Connor warned Plaintiff that if he continued to resist he would be sprayed with mace.  Plaintiff again attempted to get off the ground and Connor sprayed mace at Plaintiff.  (Id. ¶ 60.)  Plaintiff has no memory of any of these events, except that he recalls sitting on the ground at one point and being accused of carrying mace.  Plaintiff believes he responded, "I ain't got no fucking mace."  (Id. ¶ 35.)

As for the mace, Connor sprayed Plaintiff and says he aimed for his chest, although Plaintiff later complained that his eyes were burning.  (Id. ¶¶ 60, 69.)  At the time, the spray appeared to have no effect on Plaintiff who continued to struggle with the officers.  As Plaintiff punched Connor, Ceccarini hit Plaintiff on his upper left arm with his baton.  (Id. ¶¶ 61, 62.)  Ceccarini also hit Plaintiff with his baton on his right thigh as Plaintiff kicked him.  (Id.)  During this time, Connor called for further

assistance.  (Id. ¶ 63.)[4]  Officer Richard A. Riccio ("Riccio") responded to Connor's call and stopped his vehicle in the middle of the intersection "so nobody would run anybody over."  (Id. ¶¶ 64-65.)  Riccio saw Connor, Ceccarini and Plaintiff rolling on the ground. (Id. ¶ 66.)  Riccio joined the fray and, together with Connor and Ceccarini, was able to pin Plaintiff to the ground.  (Id. ¶ 67.)  Plaintiff, who continued to struggle against the officers, was eventually handcuffed with his hands behind his back.  (Id.)  Plaintiff was charged with five misdemeanor violations, including: (1) marked lanes violation; (2) failure to stop for a police officer; (3) negligent operation of a motor vehicle; (4) disorderly conduct; and (5) resisting arrest.  (Id. ¶ 68.)

Andrew Reardon ("Reardon"), an eyewitness to the scene, confirms salient aspects of the police officers' testimony.  Reardon stated that he observed Plaintiff's van "weaving back and forth across double yellow," fully crossing the double yellow lines four times.  (Id. ¶ 107.)  Reardon testified that he saw Plaintiff's van pulled over on the side of the street and that his van "was blocked in by the first cruiser in front and the second cruiser behind."  (Id. ¶ 109; Ex. 19 (Attached to Defs. SOF) at 32.) Reardon, who parked his car in a church parking lot facing Plaintiff's van, heard police officers repeatedly yelling at Plaintiff to unlock his door, open the door, open his window, and turn off the engine.  Reardon confirmed that the police officers were not getting any response from Plaintiff.  (Defs. SOF ¶ 110.)  In a written statement,

---

[4] Plaintiff disputes fighting with the police officers.  (Pl. SOF ¶¶ 59-62.) However, Plaintiff does not refer to any evidence in the record to refute the police officers' recollection of events and, as indicated, Plaintiff himself has no memory of this portion of the incident.

Reardon indicated that he saw a police officer smash Plaintiff's driver side window and remove him from the vehicle, while the two officers and Plaintiff "struggled quite a bit." (Id. ¶ 111; Ex. 31 (Attached to Defs. SOF).) Reardon stated that the struggle ended when a third police officer joined the effort. (Defs. SOF ¶ 111.)[5]

Once Plaintiff had been subdued, Connor called for an ambulance because Plaintiff had blood on his left hand and appeared to have an injury to his head, where his head hit the pavement. (Id. ¶ 71.) After Plaintiff was handcuffed, Riccio asked him if he was injured. Plaintiff stated only that his eyes were burning. (Id. ¶ 69.) Riccio noted that Plaintiff, who was no longer combative, "had a weird look on him" and did not smell of any alcohol. (Id.) Riccio asked Plaintiff if he was diabetic, to which Plaintiff responded, "Yeah." (Id.) Riccio also asked Plaintiff if he had eaten that day and taken his medication, to which questions Plaintiff answered "No." (Id.) Riccio also asked Plaintiff if he had his diabetes medication with him, and Plaintiff responded that it was in his vehicle. (Id. ¶ 72.) When the ambulance arrived on the scene with two emergency medical technicians ("EMTs"), Michael Pietrano ("Pietrano") and Mark Theroux ("Theroux"), Riccio informed them that Plaintiff was diabetic and his medication was in his vehicle. (Id. ¶¶ 72, 95.) Ceccarini asserts that he did not know Plaintiff was suffering from diabetic shock until he was told by a paramedic as Plaintiff was being placed in the ambulance. (Id. ¶ 81.) Similarly, Connor asserts that he did

---

[5] A second eyewitness, David Davenport ("Davenport") also observed the incident. However, Plaintiff has moved to strike his testimony, which the court has granted, and the court has not considered it for purposes of deciding Defendants' motion for summary judgment.

not learn that Plaintiff was suffering from diabetic shock until later that afternoon after he had filed his written report of the incident at the police station. (Id. ¶ 82.)

Pietrano and Theroux arrived at the scene at approximately 8:45 a.m. (Id. ¶ 95.)[6] As Pietrano and Theroux were putting Plaintiff in the ambulance, Riccio approached Theroux and said that he found Plaintiff's bag of diabetic materials. (Id. ¶ 101.)[7] Plaintiff has no memory of any of these events, except that he recalls being in an ambulance. (Id. 35.) Theroux tested Plaintiff's blood sugar in the ambulance and noted it was low. (Id. ¶ 102.) In the ambulance, Plaintiff complained that he had pain in his left shoulder and left arm or lower left elbow. (Id. ¶ 105.) Theroux examined Plaintiff but found no bruising, deformity, or abrasions and did not note any injury. (Id.)

It is, however, undisputed that both Plaintiff and Connor sustained injuries during the incident. Plaintiff suffered burning eyes, a sore left elbow and a scrape on his forehead (which did not require stitches). (Id. ¶ 85.) Connor suffered a laceration to his hand and cuts to both of his knees. (Id. ¶ 86.) As to the charges against Plaintiff, a state court judge found Plaintiff "not responsible" as to the charge of crossing marked lanes. On the remaining four counts, the judge placed Plaintiff on pre-trial probation pursuant to Mass. Gen. L. ch. 276, § 87. (Id. ¶ 83; Ex. 15 (Attached to Defs. SOF).)

II. STANDARD OF REVIEW

---

[6] The time appears incorrect, as Connor stated he first got the call about Plaintiff's erratic driving at 8:43 a.m. which would mean that the entire incident would have spanned two minutes. The exact timing is not material to the present motion.

[7] Although Theroux does not identify the police officer who approached him, Riccio testified that it was he who informed the EMTs that Plaintiff was diabetic and his medication was in his vehicle. (Defs. SOF ¶¶ 72, 95.)

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## III. DISCUSSION

### A. Claims Against Connor and Ceccarini

In their motion for summary judgment, Connor and Ceccarini seek to shield themselves from liability by invoking the protection of qualified immunity. The qualified immunity inquiry comprises a two part test. A court must determine whether (1) the plaintiff's allegations, if true, establish a constitutional violation and, if so, (2) whether the constitutional right at issue was clearly established at the time of the putative violation. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). Although the Supreme Court has indicated that the inquiry need not be taken sequentially, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), if a court finds that "no constitutional

right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Put another way, if a plaintiff fails to establish a constitutional violation, the court need not decide whether the defendant would nonetheless be entitled to qualified immunity.

In any event, plaintiffs bear the burden of proof as to whether a constitutional violation occurred and defendants bear the burden of proof as to whether they are entitled to qualified immunity. *See Gelinas v. Boisselle*, 2011 WL 5041497, at *5 (D. Mass. Oct. 17, 2011). The same qualified immunity standard that applies under section 1983 applies to claims under the MCRA. *See Howcroft v. City of Peabody*, 747 N.E.2d 729, 746 (Mass. App. Ct. 2001); *Duarte v. Healy*, 537 N.E.2d 1230, 1232 (Mass. 1989) ("We conclude it to be consistent with the intent of the Legislature in enacting the Civil Rights Act to adopt thereunder the standard of immunity for public officials developed under § 1983.").

> a. Section 1983 Claim of Excessive Force against Connor and Ceccarini (Count I)

"Where an excessive force claim arises in the context of an arrest, the claim must be analyzed in light of the Fourth Amendment's prohibition of unreasonable searches and seizures." *LaFrenier v. Kinirey*, 478 F. Supp. 2d 126, 137-38 (D. Mass. 2007) (internal quotation marks omitted). The United States Supreme Court established a balancing test to determine the constitutionality of a particular use of force. Without excluding the importance of other factors, the Court focused the

reasonableness inquiry on three factors in particular: 1) whether the suspect is actively resisting arrest or attempting to evade arrest by flight, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) the severity of the crime at issue. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The court finds that the undisputed facts demonstrate that Connor and Ceccarini's use of force here was reasonable. First, Plaintiff actively resisted arrest and attempted to flee the scene. To be sure, Plaintiff now asserts that Connor and Ceccarini's cruisers were blocking his van, such that it was impossible for him to drive away. (Pl. SOF ¶¶ 52-54.) In this regard, Plaintiff cites Reardon's statement that Plaintiff's car was blocked in by the cruisers. (Ex. 19 (Attached to Defs. SOF) at 32.) However, Reardon's statement that Plaintiff's van "was blocked in by the first cruiser in front and the second cruiser behind" does not equate to Plaintiff's extrapolation that he was unable to escape. It is undisputed that there were no vehicles on either side of Plaintiff's van, making it possible that Plaintiff would have been able to flee as Connor and Ceccarini feared.

Nonetheless, Plaintiff denies trying to drive away or fighting with the officers. (Pl. SOF ¶¶ 59-62.) But, as Plaintiff concedes, he has little memory of the events and proffers no evidence to contradict the police officers' recollection of events, as confirmed by Reardon. Simply put, Plaintiff's bald assertions are insufficient to place Connor's and Ceccarini's versions of these events in dispute. *See LaFrenier*, 478 F. Supp. 2d at 130, 134 (noting that the plaintiff had "no recollection of the events, [and had] offered no affirmative evidence as to the encounter by the side of the road," and

that, as a result, "any discrepancies between the deposition testimony and the police report will be resolved in [the plaintiff's] favor. In all other respects, however, the Court will accept the officers' version of the roadside encounter."). By all accounts, then, Plaintiff struggled with the police officers and continued to do so even after a third police officer arrived on the scene.

Second, it is undisputed that Plaintiff's behavior posed an immediate threat not only to the officers but to others as well. The incident occurred on the side of the road, prompting Riccio, when he arrived on the scene, to position his cruiser in the middle of the intersection in an attempt to lessen the inherent danger arising from the proximity of the event. Moreover, the fact that Plaintiff injured Connor suggests that he posed a danger to the officers. Finally, several of the crimes at issue here -- resisting arrest and disorderly conduct -- were "sufficiently serious to warrant the exercise of force." *Id.* at 138.

Plaintiff's argument is not aided by his reliance on the Seventh Circuit's decision in *McAllister v. Price*, 615 F.3d 877, 882-83 (7th Cir. 2010). Unlike Plaintiff, the plaintiff in *McAllister* was described by the police officer as "lethargic and nonresponsive," and the court found that his condition rendered him "unable to flee or resist arrest" and demonstrated that he did not pose an immediate threat to the officer or public at large. *Id.* at 883. Thus, two of the three *Graham* factors which this court finds here weigh in favor of the police officers weighed in the opposite direction in *McAllister*.

In contrast, the district court's decision in *LaFrenier* is quite instructive. There, similar to the situation at bar, a police officer was dispatched in response to calls from

12

individuals who had observed the plaintiff pull his car over to the side of the road. The eyewitnesses described the plaintiff as looking ill and "not feeling well." *LaFrenier*, 478 F. Supp. 2d at 129-130. When the officer arrived at the scene, she twice asked the plaintiff to shut off his car engine and step to the rear of the vehicle. Based on the plaintiff's responses, the officer testified that she thought he might be either suffering from a medical condition or be under the influence of alcohol. *Id.* at 130-32. After exiting the vehicle, the plaintiff became angry and began to push the officer, indicating that he wanted to get back in the car. A struggle ensued. The officer, joined by a colleague, pushed the plaintiff into his vehicle several times and struck him in his left upper leg. With assistance from the second officer, the plaintiff was eventually subdued, handcuffed, and arrested. As a result of the incident, the plaintiff suffered bruising and soreness. The officer was not injured. *Id.* at 132, 133. It was later determined that the plaintiff's condition was likely caused by his having taken cold medicine containing pseudoephedrine. *Id.* at 133.

Applying the balancing test articulated in *Graham*, the district court in *LaFrenier* concluded that "no genuine dispute exists as to the objective reasonableness of defendants' use of force" and allowed the defendant's motion for summary judgment on the excessive force claim. *Id.* at 138. More specifically, the court found as follows:

> As to the first factor, it is undisputed that [plaintiff] actively resisted arrest and attempted to flee the scene throughout the encounter. Indeed, plaintiff continued resisting, even after the officers managed to get handcuffs on him and attempted to place him into the cruiser. Second, plaintiff's violent behavior clearly posed an immediate threat to himself and the officers, particularly given the fact that the

> incident took place on the side of the road, thereby creating
> the risk that [plaintiff] or defendants would be hit by
> oncoming traffic. And finally, the record shows that the
> crimes at issue here -- assault and battery on a police
> officer, resisting arrest, and disorderly conduct -- are
> sufficiently serious to warrant the exercise of force.

*Id.* As described, this is very much what occurred here as well.

Plaintiff's attempt to distinguish *LaFrenier* is unpersuasive. He argues that, unlike the situation there, his illness was the result of an easily identifiable medical condition; accordingly, Connor and Ceccarini, Plaintiff maintains, should have been aware that he was in diabetic shock based on his behavior and conduct. However, as Plaintiff's own expert Glenn B. Coffin ("Coffin"), noted, it is not possible to determine, simply by "[l]ooking at someone alone," whether he is suffering from low blood sugar or is under the influence of drugs and alcohol, and that a glucometer must be used to test blood sugar levels to make a determination of hypoglycemia. (Defs. SOF ¶¶ 153-54.) Moreover, as Coffin explained, a determination about whether an individual is hypoglycemic as opposed to intoxicated varies from person to person and requires making a distinction that is nearly impossible for an observer to judge. (Ex. 1 (Attached to Pl. SOF) at 176.) Granted, Coffin testified at his deposition that someone properly trained approaching a situation with an open mind can usually tell the difference between intoxication and diabetes. (Ex. 1 (Attached to Pl. SOF at 176). However, he also conceded that "[i]t would have been difficult" for Connor and Ceccarini to discern whether Plaintiff was suffering from hypoglycemia as opposed to intoxication, drug use, or some other condition at the time they were talking to Plaintiff through his van

window. (Defs. SOF ¶ 155.) In short, Plaintiff has not established that Connor and Ceccarini should have, or even could have, known that he was diabetic, such that their conduct could be considered unreasonable.

Even if Connor and Ceccarini were somehow able to recognize that Plaintiff was ill, a point which is in no way conceded by Defendants, that fact would be of little help to Plaintiff. As in *LaFrenier*, where the responding officer was called in response to reports that the driver was ill, the reason *why* Plaintiff was combative does not control the court's analysis as to whether the force employed by the police officers and the ensuing arrest were reasonable. *See LaFrenier*, 478 F. Supp. 2d at 138. Connor and Ceccarini, in fact, had no indication that Plaintiff was either ill or intoxicated and, further, had to employ force only when Plaintiff refused to open the door, attempted to flee, and became violent when the officers tried to remove him from the van. It is understandable that Plaintiff views the situation differently, given his stance that it was his diabetic shock which caused him to behave in this manner. But in light of Plaintiff's undisputed erratic driving, his refusal to exit the van, and his violent behavior towards Connor and Ceccarini, their use of force was both warranted and reasonable.

In sum, Plaintiff has failed to establish a Fourth Amendment violation based on Connor and Ceccarini's use of force and summary judgment is appropriate on that claim. The court therefore need not address whether Connor and Ceccarini are entitled to qualified immunity, although it is likely under these circumstances that they are. Defendants' motion for summary judgment as to Count I will therefore be allowed.

b.  Section 1983 Claim of False Arrest/Malicious Prosecution Against
Connor and Ceccarini (Count II)

i. False Arrest

"The Fourth Amendment requires arrests be based on probable cause."  *Sietins v. Joseph*, 238 F. Supp. 2d 366, 375 (D. Mass. 2003).  "If probable cause exists to arrest, then there has not been a constitutional deprivation."  *Id.*  The probable cause standard is a "relatively low threshold" for police officers to establish.  *Id.* (quoting *White v. Town of Marblehead*, 989 F. Supp. 345, 349 (D. Mass. 1997)).  "Probable cause will be found if 'the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'"  *Id.*  Moreover, "probable cause need only exist as to *any* offense that *could be* charged under the circumstance."  *LaFrenier*, 478 F. Supp. 2d at 136 (citing *United States v. Bizier*, 111 F.3d 214, 219 (1st Cir. 1997) (emphasis in original)).

Here, Defendants argue that, at the moment of arrest and under the facts and circumstances known to the police officers at the time, a reasonable police officer would have believed that there was a probability that Plaintiff was committing at least one of the offenses with which he was charged.  The court agrees.  Connor observed Plaintiff driving erratically, specifically that his van crossed into the west bound travel lane, causing vehicles traveling west to swerve to the right to avoid a collision.  (Id. ¶ 45.)  In addition, as described, the court credits Connor's and Ceccarini's uncontroverted statements that Plaintiff struggled against them and resisted arrest.

Thus, Connor and Ceccarini have satisfied the "relatively low threshold" required by the Fourth Amendment that probable cause existed regarding Plaintiff's arrest. Moreover, as Connor's and Ceccarini's conduct comports with the Fourth Amendment, the court need not address their remaining arguments regarding qualified immunity. Defendants' motion for summary judgment on Count II will therefore be allowed to the extent it claims an unlawful arrest.

ii. Malicious prosecution

To establish a claim of malicious prosecution, a plaintiff must show: "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice." *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001) (citing *Correllas v. Viveiros*, 572 N.E.2d 7 (Mass. 1991)). To transform a malicious prosecution into a claim cognizable under section 1983, the plaintiff must also demonstrate a constitutional deprivation. *Id.*; *Smith v. Mass. Dep't of Corr.*, 936 F.2d 1390, 1402 (1st Cir. 1991) ("All federal claims for malicious prosecution are borrowed from the common law tort . . . [which] imposes liability on a private person who institutes criminal proceedings against an innocent person without probable cause for an improper purpose. The federal claim under [42 U.S.C.] section 1983 for malicious prosecution differs from the state civil suit in that it requires that state officials acting 'under color of law' institute the criminal proceedings against the plaintiff and thereby deprive him of rights secured under the Constitution."). Because, as indicated, Connor and Ceccarini had probable cause to arrest Plaintiff for

the crimes alleged, Plaintiff cannot bear his burden with regard to the third prong, *see*

*Nieves*, 241 F.3d at 53, and his claim for malicious prosecution necessarily fails.  *See*

*id.* at 53; *Sheppard v. Aloisi*, 384 F. Supp. 2d 478, 491 (D. Mass. 2005) ("Obviously, if

there was probable cause for the arrest, the claim of malicious prosecution would fail.").

Even in the absence of probable cause, Plaintiff's claim for malicious

prosecution fails.  First, Plaintiff does not dispute that Ceccarini had no role in the

process of charging Plaintiff and ascribes no wrongdoing to him (Pl. SOF ¶ 80); thus,

the court will allow Defendants' motion for summary judgment as to him.  Second, as to

Connor, Plaintiff concedes that he had no formal role in the prosecutorial process and

acknowledges that "there is no evidence of affirmative pressure [by Connor] in this

case." (Pl. Opp. at 13.)  In fact, as Defendants assert, Connor's role was limited to

completing the arrest report.  Plaintiff also acknowledges that, as described by Chief of

Police Robert D. Campbell, the arresting officer simply writes the charges which must

be approved by a supervisor; the supervisor then brings the charges to the clerk

magistrate to determine if there are sufficient grounds in support, and, if the clerk

magistrate determines that sufficient grounds do not exist, no complaint is issued.

(Defs. SOF ¶ 77.)

Plaintiff disputes these facts only to the extent he claims that "Connor was the

precipitating force behind the filing of the [criminal] complaint" as well as the charges.

(Pl. SOF ¶¶ 76-78.)  In this vein, Plaintiff argues that "it is obvious that [Connor]

withheld the evidence that [Plaintiff] suffered from a common diabetic induced ailment.

It is never mentioned in his report, which served as the charging document."  (Pl. Opp.

at 13.)  As for Connor's testimony that he did not learn that Plaintiff was suffering from diabetic shock until after he had written and filed his report (Defs. SOF ¶ 82), Plaintiff asserts that "Connor's self-serving testimony [ ] may not be credible; and is belied by all of the credible information obtained from the scene of the accident."  (Pl. SOF ¶ 82.)

All this is more argument than substance.  Plaintiff points to no evidence in the record to demonstrate that Connor knew that Plaintiff was diabetic before he filed his report.  Plaintiff admits that he was not wearing any identification that would indicate he was diabetic (Defs. SOF ¶ 38) and, although the court credits Plaintiff's testimony that he stated he was diabetic, he acknowledges that at the time he was sitting in his van, looking down, with the windows closed, and, most importantly, that he is not sure if Connor heard him.  (Id. ¶ 29; Pl. SOF ¶¶ 28-29.)  In short, Plaintiff proffers no material evidence to contradict Connor's testimony that he did not hear Plaintiff state he was diabetic.  *See, e.g., Crawford-El v. Britton*, 523 U.S. 574, 600 (1988) (noting that "if the [defendant] has made a properly supported [summary judgment] motion, the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden. ") (footnote omitted).

Plaintiff's reliance on *Burke v. Walpole*, 405 F.3d 66 (2005), is unavailing.  In *Burke*, there was evidence that directly contradicted the officer's testimony that he was unaware of exculpatory information when he filed his report, namely, contemporaneous notes by an individual who claimed she called the police officer to report such evidence; construing the facts in a light most favorable to the plaintiff, the First Circuit

remanded the case to the district court.  Here, in contrast, there is no evidence in the record to contradict Connor's testimony that he was unaware that Plaintiff was diabetic until after he filed his report.

Persevering, Plaintiff nonetheless asks the court to infer that Connor had to have known of Plaintiff's diabetes but still declined to include the information in his report. Unfortunately for his cause, this request is based on an array of supposition and conjecture, including Plaintiff's conclusory argument that it is simply inconceivable that Connor did not learn that Plaintiff was diabetic at the scene of the incident when Riccio and Ceccarini themselves learned of it.  Again, such speculation, in the court's view, is both unpersuasive and insufficient.  *See Brown v. Latin Am. Music Co., Inc.*, 498 F.3d 18, 24 (1st Cir. 2007) ("In opposing a motion for dismissal for failure to state a claim, as in opposing a motion for summary judgment, general denials are insufficient and the court is not required to credit bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like.") (internal citation and quotation marks omitted).  The record before the court is devoid of any indication that Connor knew that Plaintiff was suffering from diabetes and/or diabetic shock such that he should have included it in his report.  More importantly perhaps, Plaintiff has failed to point to any evidence that the "omission" resulted from any actual malice on Connor's part.  Count II, after all, asserts a claim of *malicious* prosecution.

Given that Plaintiff has not established several of the essential elements of his malicious prosecution claim, he cannot demonstrate that his prosecution comprised a constitutional violation under section 1983.  *See Smith*, 936 F.2d at 1402.  Accordingly,

the court need not decide whether Connor and Ceccarini may also be entitled to qualified immunity -- although, again, that is likely -- and will allow Defendants' motion for summary judgment as to Count II to the extent it claims malicious prosecution.

### 2. MCRA Claim Against Connor and Ceccarini (Count III)

As an initial matter, the court notes that, in opposition to Defendants' motion for summary judgment, Plaintiff does not meaningfully address his MCRA claim against Connor and Ceccarini. Rather, he merely asserts that his "analysis of the remaining state counts does not need to be extended" because the "purpose of the MCRA is to provide a remedy co-extensive with § 1983." (Pl. Opp. at 16.) Still, because Plaintiff specifically mentions state law claims, it is not clear if he wishes to pursue these claims independently, despite the fact that no such independent state law claims are pled in his complaint, or within the context of the MCRA only. In any event, because the court has concluded that summary judgment is appropriate as to Plaintiff's false arrest and malicious prosecution claims under section 1983, summary judgment as to those claims, to the extent Plaintiff might wish to pursue them as independent state law claims, is also appropriate and will be granted to Connor and Ceccarini.

As for the MCRA claim itself, Plaintiff must prove that his exercise or enjoyment of rights secured by the constitution or laws of either the United States or Massachusetts has been interfered with, or attempted to be interfered with, by threats, intimidation or coercion. *See* MASS. GEN. L. ch. 12, § 11I. Although the MCRA is the state "counterpart" to section 1983 and is basically "coextensive with" the federal

statute, there are some differences. For example, to succeed on an MCRA claim, a plaintiff, unlike with section 1983, must show that the derogation of rights occurred "by threats, intimidation or coercion." *Bally v. Northeastern Univ.*, 532 N.E.2d 49, 52 (Mass. 1989). "A 'threat' means the 'intentional exertion of pressure to make another fearful or apprehensive of injury or harm.'" *Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009) (quoting *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 631 N.E.2d 985 (1994)). "Intimidation" means putting a person in fear for the purpose of compelling or deterring his or her conduct. *Id.* "Coercion" means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do. *Id.*

The MCRA contemplates a two-part sequence: liability may be found where (1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he has the constitutional right to do. *See id.* Here, because Plaintiff has not established that Connor and Ceccarini violated any constitutional right, his MCRA claim against them must also fail. *See* Mass. Gen. L. ch. 12, § 11I; *see also Parks v. Town of Leicester*, Civil Action No. 10-30120-FDS, 2011 WL 864823, at *5 (D. Mass. March 9, 2011) (for purposes of the MCRA, "the element of 'threats, intimidation, or coercion' must be separately present *in addition* to the violation of rights.") (emphasis added). The court, therefore, will allow Defendants' motion for summary judgment as to Count III.

3. Claim of Intentional Infliction of Emotional Distress Against Connor and Ceccarini (Count VI)

In order to establish that Connor and Ceccarini are liable for the tort of intentional infliction of emotional distress, Plaintiff must prove that: (1) they intended to cause, or should have known that their conduct would cause emotional distress; (2) their conduct was extreme and outrageous; (3) their actions caused Plaintiff distress; and (4) Plaintiff suffered emotional distress. *See Fredette v. Allied Van Lines*, 66 F.3d 369, 374 (1st Cir. 1995). In the court's view, no reasonable factfinder could resolve this claim in Plaintiff's favor.

At the outset, the court notes that Plaintiff does not address this claim in his opposition to Defendants' motion for summary judgment and did not raise it at the hearing thereon. But even had Plaintiff done so, the court finds that summary judgment for Connor and Ceccarini is appropriate as to this count as well. As in *Sheppard v. Aloisi*, the court concludes that "[w]here probable cause was at least arguable, and a reasonably objective police officer could have determined, based on the evidence that was available at the time of the arrest, that [Plaintiff] was guilty of the accused crime," it can not conclude that the complained of conduct was "extreme and outrageous." 384 F. Supp. 2d at 495. To be sure, an arrest "is a traumatic experience, especially if the charges later prove to be false" but that that "factor alone does not give rise to a claim for intentional infliction of emotional distress." *Id.* Similarly here, because the court finds that Connor and Ceccarini had probable cause to arrest Plaintiff and that their use of force was objectively reasonable under the circumstances, their conduct cannot be said to rise to the level of "extreme or outrageous."

B. Claims Against Agawam and the APD

    1. Section 1983 Claim Against Agawam and the APD (Count IV)

    Plaintiff alleges that Agawam and the APD violated section 1983 because they maintain a policy, custom, practice or pattern of: (1) using excessive force on the civilian population; (2) failing to provide adequate training to police officers particularly about the effects of low blood sugar and diabetes; (3) failing to provide adequate supervision of police officers; (4) failing to discipline police officers who violate the rights of its citizens; and (5) failing to prevent officers from filing false charges to mask other misconduct.

    "Under Section 1983, it is well established that a municipality is not liable for the actions of its employees simply by virtue of the employment relationship." *Freeman v. Town of Hudson*, 2012 WL 911430, at *8 (D. Mass. Mar. 15, 2012) (citing *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 691 (1978)). "Instead, under *Monell* and subsequent cases, a plaintiff seeking to prove municipal liability under Section 1983 must identify a municipal policy or custom that caused the plaintiff's injury." *Id.* at 694. Moreover, "[i]nadequate training rises to the level of municipal custom or policy only when 'the need for more or different training is so obvious, and inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been reasonably indifferent to the need.'" *Jackson v. Inhabitants of Town of Sanford*, 1994 WL 589617, at *5 (D. Me. Sept. 23, 1994) (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1159 (1st Cir. 1989)). Thus, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a

municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Canton v. Harris*, 489 U.S. 378, 389 (1989).

The following facts are undisputed:

(1) ) Sergeant Richard J. Niles ("Niles") is in charge of the training program for the Department of Police and he ensures that individuals go to the appropriate training programs that are approved by the Massachusetts Criminal Justice Training Commission.  (Defs. SOF ¶ 130.)

(2) Officers attend in-service training which includes defensive tactics, including mace and use of force.  If an officer is unable to physically control an individual, the next step is to use a chemical agent such as mace.  (Id. ¶ 128.)

(3) Officers receive in-house training which includes: breathalyzer training, firearms training, first aid, CPR and defibrillator training.  Officers also attend three days of additional training at the Police Academy.  (Id. ¶ 129.)

(4) While at the Police Academy, each cadet receives thirty-two hours of first responder training and eight hours of CPR training.  After graduation, the Department of Police conducts a four hour CPR training course and a four hour First Responder training course each year.  (Id. ¶¶ 133-34.)

(5) In 2006, which was the last First Responder course prior to the March 15, 2007 incident, officers were trained to recognize the signs of insulin shock and diabetic coma.  However, officers are not supposed to diagnose these conditions as that is beyond their training abilities.  (Id. ¶ 136, 137.)

(6) With respect to low blood sugar symptoms, officers were instructed in 2006 that signs include: shallow rapid breathing, rapid full pulse rate, cold clammy skin, dizziness, confusion, and that an individual may be combative.  (Id. ¶ 138.)

(7) Officers are taught that their safety is the primary objective, because if they are injured, they cannot treat the patient.  (Id. ¶ 140.)

(8) Connor and Ceccarini both completed the First Responder course, were tested on the subject matter, and received scores of 96 percent and 88 percent, respectively.  (Id. ¶ 136.)

(9) The orders and policies of the Police Department are written by the Police Chief and Lieutenants.  They are read aloud at roll call when they are first enacted.  In addition, each officer receives a copy.  The rules and regulations of

the Police Department are written by the Municipal Police Institute, Inc. Each officer received a copy of them when he or she was hired. (Id. ¶ 145.)

These facts standing unopposed, it becomes clear that Plaintiff's entire claim against Agawam and the APD hinges on a statement by Ceccarini at his deposition that he, personally, would appreciate more training regarding detection of signs of insulin shock or diabetic shock or symptoms of diabetes. (Ex. 3 (Attached to Pl. SOF) at 78.) Without more, however, an officer's indication that he would welcome additional training is not tantamount to an admission that the training he received was inadequate. *See Santiago v. Fenton*, 891 F.2d 373, 381-82 (1st Cir. 1989) (affirming district court's denial of summary judgment as to plaintiff's section 1983 claim against a municipality because the plaintiff "did not specify how [the police officer] training . . . was inadequate" nor "suggest that [the] training was inferior by the standards of the profession."). As Defendants assert, Plaintiff has proffered no evidence that the policies and regulations maintained by Agawam and the APD are in any way insufficient. Nor has Plaintiff argued that Agawam and the APD maintain any custom that would appear to contradict or undermine any of these policies or regulations.

To the contrary, Plaintiff's own expert, Glenn Coffin, concedes that the training materials used by the Department of State Police to train officers "appear to cover many, if not all, of the various formats that comprise the curriculum of First Responder," and, in fact, appear "sufficient." (Id. ¶ 163.) Moreover, as previously mentioned, Coffin acknowledged that it is not possible to determine, simply by "[l]ooking at someone alone," whether an individual is suffering from low blood sugar or is under the influence

of drugs and alcohol and that, a glucometer must be used to test blood sugar levels to make a determination of hypoglycemia. (Id. ¶¶ 153-54.) Thus, Coffin conceded that "[i]t would have been difficult" for Connor and Ceccarini to discern whether Plaintiff was suffering from hypoglycemia as opposed to intoxication, drug use, or some other condition at the time that they were talking to Plaintiff through his van window. (Id. ¶ 155.)

In sum, the court finds that Ceccarini's solitary statement that he believes additional training might be useful is insufficient to establish that the need for more training was "so obvious, and [the] inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been reasonably indifferent to the need.'" *Jackson*, 1994 WL 589617, at *5. Accordingly, the court will allow Defendants' motion for summary judgment as to Count IV.

### 2. MCRA Claim Against Agawam and the APD (Count V)

Agawam and APD are entitled to summary judgment on the MCRA claim as well because under Massachusetts law a municipality cannot be sued under the MCRA. *See Kelley v. LaForce*, 288 F.3d 1, 11 n.9 (1st Cir. 2002) (citing *Howcroft*, 747 N.E.2d at 744) (concluding that, unlike section 1983, a municipality is not a "person" within the terms of the MCRA). Plaintiff does not mention, much less address, Defendants' argument in this regard. The court will therefore allow Defendants' motion for summary judgment as to Count V.

## IV. Conclusion

For the reasons stated, Defendants' motion for summary judgment is ALLOWED in its entirety.

IT IS SO ORDERED.

DATED: July 12, 2012

    /s/ Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge